IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CLARENCE C. CRUTCHER, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 04-0499-WS-M |
| | ) | |
| MOBILE HOUSING BOARD, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter is before the Court on defendant Mobile Housing Board's Motion for Summary Judgment (doc. 42). The Motion has been briefed and is ripe for disposition at this time.[1]

**I.      Background.**

　　*A.      Nature of Case.*

On July 30, 2004, plaintiff Clarence C. Crutcher, III ("Crutcher") initiated this action against defendant Mobile Housing Board (the "Board"). According to the Complaint, Crutcher has been employed by the Board as a Rehabilitation Specialist since 1981. In 2001, Crutcher sustained a work-related injury resulting in paralysis of his right arm and shoulder. The Complaint interposes two causes of action, both pursuant to Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101,

---

[1]　　In reviewing the briefs, the Court observes that defendant's Reply Brief (doc. 61) is 17 pages long. (It is incorrectly numbered at 18 pages, as defendant's word processor curiously skipped page 2 in the numbering process.) Local Rule 7.1(b) provides that "[a] reply brief by movant shall not exceed fifteen (15) pages in length." (*Id.*) Defendant has neither requested nor received permission to exceed this limit. Given the attention that LR 7.1(b) has received in briefing the Rule 56 motion in this case (see docs. 55, 57, 58), defendant's inattentiveness to that rule in submitting his reply brief is difficult to understand. Nonetheless, in the exercise of its discretion, and given the relatively minor nature of the infraction, the Court will consider defendant's submission in its entirety. Failure to abide by the Local Rules may result in future nonconforming submissions being stricken *sua sponte*. Additionally, the Reply Brief includes cryptic references to defendant's initial brief that cite to nonexistent page numbers. For example, pages 16 and 17 of the Reply Brief include references to the principal brief at "¶ 2, p. 27" and "¶ 5, p.27." This is confusing because the principal brief was only 23 pages long and the paragraph numbers do not correspond to any numbered paragraphs in said brief.

*et seq.* (the "ADA"). Crutcher's first theory of liability is that the Board failed and refused to provide him with reasonable accommodations that he requires in order to perform the essential functions of his job with his disability. Plaintiff's second theory of liability is that defendant interfered with the exercise of his rights under the ADA by unilaterally imposing restrictions on his ability to drive (even though he was medically cleared to drive), reprimanding him for failing to meet deadlines that he could not satisfy because the Board would not allow him to drive, and compelling him to use personal funds and equipment to perform assigned duties. The Complaint states that plaintiff seeks declaratory relief, injunctive relief, damages, costs and attorneys' fees.

**B.    Facts.**[2]

1.    *Crutcher's Employment History.*

Crutcher was hired by the Board in 1981 as a Rehabilitation Specialist. The job description for this position reflects that Crutcher's principal job function was to prepare cost estimates for property owners regarding rehabilitation of property in community development areas. (Plaintiff's Exh. 1.)[3]

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 353 F.3d 1287, 1292 (11th Cir. 2003) (on summary judgment, "the district court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor"). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[3]    Plaintiff's Exhibit 1 is a copy of the job description. This exhibit, like dozens of others submitted by the parties for summary judgment purposes, lacks authentication or verification. Generally, courts ruling on Rule 56 motions may consider only admissible evidence. *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted). Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial. *Bozeman v. Orum*, 199 F. Supp.2d 1216, 1222 (M.D. Ala. 2002). Those requirements were not followed as to this exhibit. Nonetheless, there appears to be no dispute that "Plaintiff's Exhibit 1" is in fact a true and accurate copy of the job description; as such, it is apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will consider it on that basis. The same rationale applies to other unverified, unauthenticated exhibits in the record.

Under the heading of "special requirement," the job description reflects the holder of this position must possess a valid Alabama Driver's License, presumably for purposes of traveling to rehabilitation or construction sites, inasmuch as a substantial portion of the Rehabilitation Specialist's job is conducting property inspections in the field.  (*Id.*)  Plaintiff continues to be employed by the Board as a Rehabilitation Specialist today.

<em>2.     Crutcher's Impairment.</em>

On or about December 3, 2001, Crutcher sustained what was initially diagnosed as a "right shoulder contusion" when he slipped and fell at a job site.  (Plaintiff's Exh. 6.)[4]  Over time, it became clear that Crutcher's injuries were far more serious than a mere shoulder bruise.  Three weeks of physical therapy brought plaintiff no relief and by late December 2001 he "was unable to use his right arm due to severe pain and loss of motor function."  (Plaintiff's Exh. 21.)  A report prepared by plaintiff's treating orthopedist, Dr. Frederick N. Meyer, dated August 9, 2002 reflects that Crutcher had been "totally unable to move his arm" since December 2001.  (Plaintiff's Exh. 22.)  Based on plaintiff's complete inability to use his arm for eight months and medical professionals' inability to explain that phenomenon, Dr. Meyer opined that Crutcher "is going to have 100% permanent partial impairment of the right upper extremity which converts to 60% of the whole person."  (*Id.*)[5]  Plaintiff has never regained any use of his arm.

Plaintiff's wife, Anne Sieller Crutcher, testified based on her observations of her husband following his December 2001 injury that he is substantially limited in performing basic household tasks (*e.g.*, washing dishes, doing laundry, mowing the lawn), personal hygiene functions (*e.g.*, bathing, shaving, tying his shoes, trimming his nails, flossing his teeth), and eating (*e.g.*, cooking/preparing food,

---

[4]     The Court's task in reviewing the summary judgment record has been hindered by plaintiff's disorganized submission of several hundred pages of evidentiary material, which has complicated the Court's task on summary judgment by (i) effectively obligating the undersigned to organize plaintiff's submissions for him and (ii) leading to an incomplete summary judgment record that is difficult to follow.

[5]     The Board received Dr. Meyer's report in August 2002 and understood that Crutcher had been placed at maximum medical improvement ("MMI") and given a 100% permanent partial disability rating for his right shoulder.  (Plaintiff's Exh. 35.)

cutting food).  (A. Crutcher Aff., ¶ 6.)  Plaintiff cannot perform any of these functions without

substantial assistance from Mrs. Crutcher.  (*Id.*, ¶¶ 7-8, 10.)  Nor can plaintiff participate in hunting,

fishing and boating, all hobbies that he had once enjoyed.  (*Id.*, ¶ 9.)[6]

      The Board's observations of plaintiff's limitations in the workplace echo those identified by his

treating physician and spouse.  Indeed, as of May 1, 2002, Crutcher's supervisor, Rehabilitation

Director Robert Beach ("Beach"), felt that plaintiff could not use his right arm and hand, could not write

or type using his right hand, and could not perform various site inspection duties (such as climbing

ladders, crawling under houses, getting into attics, etc.) because of his impairment.  (Plaintiff's Exh. 17.)

      During 2002, the Board (by and through Beach) repeatedly requested information from Dr.

Meyer as to Crutcher's impairment.  In early August 2002, Dr. Meyer answered a series of questions

posed by Beach as to plaintiff's functional limitations.  In those responses, Dr. Meyer opined that

Crutcher could not climb ladders, crawl under houses, operate two-handed cameras, take field

measurements, take written field notes, or safely inspect and traverse a construction work site.

(Plaintiff's Exh. 19.)  However, Dr. Meyer also indicated that Crutcher could "safely drive a vehicle

and negotiate in traffic," that he could operate a typewriter or computer with one hand, and that he

could write specifications, scope of work, cost estimates and the like.  (*Id.*)  In October 2002, Dr.

Meyer issued another report that essentially replicated his prior recommendations.  In particular, Dr.

Meyer opined in October that Crutcher could take photographs with one hand, obtain information from

property owners, drive a vehicle with an automatic transmission, prepare detailed written estimates and

drawings, and prepare other documentation (although it would be better if Crutcher could dictate these

documents or type them on a keyboard instead of handwriting them), but that he could not climb

---

      [6]     Mrs. Crutcher's affidavit is consistent with, albeit more detailed than, Crutcher's
deposition testimony, wherein he indicated that he is "not able to do a number of things that [he] was
able to before the accident," including working outside and cooking.  (Crutcher Dep., at 56-57.)
Crutcher also testified that his "life has been turned upside-down" by his impairment and that "it's not
the same" as it once was.  (*Id.*)

ladders or crawl under buildings.  (Plaintiff's Exh. 30.)[7]

By January 2003, Dr. Meyer saw Crutcher again for an evaluation, at which time he appeared to despair of any medical improvement or cure to plaintiff's condition.  Indeed, Dr. Meyer opined, "[a]t this point, I think all we can really do is continue to follow and support him" and reiterated that plaintiff was not to use his right upper extremity.  (Plaintiff's Exh. 54.)

### 3.    The Board's Interactions with Crutcher Post-Injury.

#### a.    Adjustments to Plaintiff's Duties.

In the immediate aftermath of Crutcher's injury, the Board placed him on light duty, including "desk work, writing, reading, computer operation, operating a telephone, copy machine, fax machine, driving an automobile, [certain] inspection work" and the like.  (Plaintiff's Exh. 5.)  A Return-to-Work Plan prepared on December 3, 2001 imposed limitations on Crutcher's work, including restrictions on lifting, pushing, pulling and reaching.  (Plaintiff's Exh. 8.)  As Crutcher's condition deteriorated during December and into January, the Board adjusted his work assignments accordingly.  As of January 18, 2002, the Board entered a new Return-to-Work Plan forbidding Crutcher from all use of his right arm and limiting him to paperwork that he could perform with his left arm, even though he is right-handed. (Plaintiff's Exh. 7, 9.)  Plaintiff's work duties were altered so that he would no longer have to engage in climbing, crawling, or getting on ladders.  (Crutcher Dep., at 55.)[8]  Plaintiff was instructed that if at any time he felt he was being assigned tasks that exceeded his work restrictions, he should contact the Human Resources Department.  (Knight Dep., at 44.)[9]  He never did so.

---

[7]    Dr. Meyer's October 2002 report expressed dismay at the Board's repeated requests for information, which he contended were "almost approaching harassment" and were motivated by an attempt to get him to disqualify Crutcher from working.  (Id.)  Dr. Meyer explained that he believed he had been very clear in laying out restrictions for Crutcher, that it was up to the Board to decide whether plaintiff could perform his job duties consistent with those limitations, and that he did not intend to complete additional paperwork for the Board "without a significant up-front charge."  (Id.)

[8]    As one defense witness explained, Crutcher's "duties were being tailored around those restrictions" set forth in his Return-to-Work Plans.  (Knight Dep., at 44.)

[9]    The deposition at which Shirley Knight testified was actually a Rule 30(b)(6) deposition of the Board at which Knight was the designated witness.  For ease of reference, this Order will

On January 24, 2002, the Board notified Crutcher in writing as follows: "you are not to drive any [Board] vehicles, effective immediately, until you receive full release to standard duty from your physician.  If you require transportation to the field, we will arrange to have one of the other Rehabilitation Specialist [*sic*] to drive you."  (Plaintiff's Exh. 10; Beach Dep., at 36.)  He was also barred from operating his own vehicle on Board business or time.  (Plaintiff's Exh. 11.)[10]  This driving restriction remained in place as of June 2003.  (*Id.*)[11]  In the words of Beach, the effect of this unilateral restriction was to "curtail[] the efficient use of his time and thus the efficient operation of this department."  (*Id.*)  Beach allowed that requiring Crutcher to wait to inspect a site until someone was available to drive him "could" hamper his ability to perform his job duties in a timely manner.  (Beach Dep., at 80.)  In August 2003, the Board refitted a Board car and authorized Crutcher to resume driving on Board business.  (Plaintiff's Exh. 31, 32, 63.)

> b.    *Plaintiff's Job Performance.*

As of May 1, 2002, Beach felt that Crutcher was producing at only 50% or less because of his impairment.  (Plaintiff's Exh. 17.)  Beach expressed frustration in a May 1, 2002 memorandum that Crutcher's performance had been so curtailed at a time when the Rehabilitation Department was exceptionally busy.  (*Id.*)  At that time, Crutcher's duties were limited to light duty or desk work, such

---

delineate this deposition as "Knight Dep." even though it was technically the Board's Rule 30(b)(6) deposition, by and through Knight.

[10]    An internal memorandum prepared by Beach indicates that "[t]he vehicle driving restriction was imposed by Human Resources due to possible liability in the event of an accident." (Plaintiff's Exh. 17.)  The same memo admits that Crutcher's physician "never (to my knowledge) restricted him from driving."  (*Id.*)  The Board's human resources director, Shirley Knight, testified that she decided to prohibit Crutcher from driving in consultation with the Board's workers' compensation carrier.  (Knight Dep., at 48.)  She characterized this decision as a "liability issue."  (*Id.* at 54, 74.)  Beach understood that Crutcher "was not prohibited from driving from a medical standpoint but only from the Human Resource Department."  (Beach Dep., at 37.)

[11]    Information obtained by Beach in July 2002 indicated that either Crutcher's vehicle or a Board vehicle could be readily modified for less than $250 to make it easier for plaintiff to drive. (Plaintiff's Exh. 20.)  The particular modifications considered were adding an extension to the gear shift, providing a key extension to facilitate starting the vehicle, and providing a steering device (knob).  (*Id.*)

as telephone communication with owners and contractors, checking Davis-Bacon payrolls, reviewing payment requests, preparing cost estimates, and engaging in office functions (*e.g.*, typing, copying, faxing, using computer and telephone) with his left hand. (*Id.*)  On May 3, 2002, Beach estimated that Crutcher's total job performance efficiency, taking into account his impairment and Board-imposed driving restrictions, was just 26.9%. (Plaintiff's Exh. 18.)  Although Crutcher could perform desk work, it was difficult and time-consuming for him to type with only one hand, and his non-dominant one at that; indeed, it took Crutcher one full hour to type a three-sentence memorandum. (*Id.*)[12]

Despite these difficulties with plaintiff's productivity as a result of his injury, the Board did not transfer him, demote him or reduce his salary. (Plaintiff's Exh. 35.)  During all times material hereto, the Board employed three Rehabilitation Specialists, including Crutcher. (Beach Dep., at 63-64.)  Furthermore, Board records confirm that as of January 2003 plaintiff was responsible for 40% of the Department's active projects. (Beach Dep., at 58.)  Crutcher was a "major producer" for the Department at that time, and remains so today. (*Id.* at 60.)  In doling out work assignments to Rehabilitation Specialists, Beach endeavors to assign projects in a fair and equitable manner, with due regard for plaintiff's disability. (*Id.* at 61.)  As a result, Beach gives Crutcher a disproportionate share of commercial Davis Bacon assignments because those tasks are primarily desk work. (*Id.*)  Beach testified that he has "no problem with Mr. Crutcher's performance at this time." (*Id.* at 64.)

For several years preceding his injury, plaintiff had consistently received "satisfactory"

_____

[12]      Crutcher, like all other Rehabilitation Specialists, had been required by the Board to begin performing all of his own clerical work.  To that effect, a Board memorandum dated March 26, 2002 informed all Rehabilitation Specialists (including Crutcher) that "beginning immediately, you are directed to do your own clerical work," including typing memos and letters, preparing reports and cost estimates, making copies, sending faxes, mailing, filing and the like. (Plaintiff's Exh. 14.)  In the wake of this directive, Beach encouraged Crutcher on multiple occasions to type, use the computer and prepare his own reports and memos to the greatest extent possible. (Beach Dep., at 75.)  Beach insisted that Crutcher "has always been given the option to use clerical staff," but he did not deny that Crutcher had been given the March 26, 2002 memo and that he had frequently been encouraged to become more self-reliant with computer and clerical tasks. (*Id.* at 81-82.)  For her part, Knight testified that at some point she "put a stop" to any limit on Crutcher's ability to obtain clerical assistance. (Knight Dep., at 72-73, 89.)

performance evaluations.  (Plaintiff's Exh. 45.)[13]  That score changed in Crutcher's review for the first half of 2002, wherein he received a service rating of "considerable room for improvement" based on a "decline in performance, lack of attention to details and failure to meet reasonable schedules and deadlines [*sic*]."  (*Id.*)  In the July 2002 review, Beach explained that Crutcher had difficulty in completing assigned duties in a timely, thorough and accurate manner; that he had "become undependable" and lacked initiative; and that he had not made necessary adaptations since incurring his injury.  (*Id.*)  Upon receiving this review, Crutcher initiated an internal grievance.  (Plaintiff's Exh. 46.)  Pursuant to the grievance process, on September 19, 2002 the Board revised plaintiff's service rating for the first half of the year to "satisfactory performance," thereby eradicating the previous "considerable room for improvement" mark.  (Plaintiff's Exh. 59.)

Crutcher's performance reviews for the second half of 2002 and for the first half of 2003 assigned him a service rating of "satisfactory performance."  (Plaintiff's Exh. 45.)  The record does not reflect that plaintiff has received any downwardly-biased evaluations because of his disability following July 2002; furthermore, the July 2002 evaluation was modified to "satisfactory" following plaintiff's grievance of same.

c.      <em>The Interactive Process.</em>

At unspecified times, plaintiff had discussions with his direct supervisor, Beach, about his functional limitations in the workplace.  (Crutcher Dep., at 18.)[14]  Crutcher also testified that he had no

---

[13]     Plaintiff's Exhibit 45 is a compilation of multiple service reviews for Crutcher spanning a period of several years.  Plaintiff's Exhibit 47 appears to be a similar compilation, and is largely duplicative of Exhibit 45.

[14]     Knight testified that an Office Assistant named Peggy Sutherland also met with Crutcher to discuss accommodations that might enable him to perform his job duties.  (Knight Dep., at 46.)  The upshot of these discussions was that Crutcher was assigned filing duties "and that, if he felt that he could not do that, he was to contact the HR office."  (*Id.*)  However, Sutherland denied any recollection that she had ever sat down with Crutcher to discuss his limitations and potential accommodations.  (Sutherland Dep., at 25-26.)  Sutherland testified that she was never even aware that Crutcher, by and through counsel, had requested a series of accommodations.  (*Id.* at 53.)  Because the evidence must be examined in the light most favorable to Crutcher on summary judgment, the Court credits Sutherland's testimony on this point, and does not credit Knight's.

other discussions with anyone at the Board about accommodations for his job.  (*Id.* at 19.)  Crutcher could not recall whether he had ever personally expressed dissatisfaction to Beach or anyone else at the Board with the nature and extent of their accommodation of his disability.  (*Id.* at 54-55.)  For his part, Beach testified that he met with plaintiff informally in his office "a number of times" to discuss potential accommodations, with the discussion proceeding as follows:

> "I said: Do you have a problem?  What is the problem?  Can we help you?  What do you need?  If you don't think that you can physically do something, don't try to do it; let me know.  We'll get some assistance."

(Beach Dep., at 55.)

Crutcher testified that he felt he was being discriminated against as early as October 4, 2002. (Crutcher Dep., at 56.)  On October 14, 2002, plaintiff's then-counsel wrote a letter to the Board's counsel requesting the following accommodations: (a) permission to drive on the job, (b) clerical assistance, (c) a tape recorder, (d) an assistant to help him in the field for approximately 15 hours per week with such tasks as crawling under houses or holding ladders, and (e) a measuring wheel. (Defendant's Exh. C.)[15]  The October 2002 letter indicated that plaintiff was also exploring the option of a one-handed camera.

On February 5, 2003, plaintiff's counsel sent the Board's counsel a list of seven requested accommodations, including the following: (a) a Dictaphone to enable Crutcher to record notes quickly and efficiently, (b) a professional distance measuring tool for use in measuring buildings (without the need for another person to hold a tape measure), (c) a digital camera that could be operated with one hand, (d) a software program to facilitate preparation of floor plans without rulers and scales,[16] (e)

---

[15]     Defense counsel included a second copy of Exhibit C in the summary judgment record as Exhibit I.

[16]     With regard to the floor plan software, plaintiff testified that his department was "not doing floor plans as often now" as it had previously, but that it was not he was "not sure if rare" would be an accurate characterization of the frequency with which they did so.  (Crutcher Dep., at 42.) Crutcher testified that there were times after December 2001 when he had needed to generate such floor plans, but that he had not been able to do so.  (*Id.* at 43.)  He also allowed that it was "probably true" that it was not a "regular function" of his job to generate floor plans as of the date of his deposition (*id.*), but it is unclear from the record when this duty ceased being a regular function of his job.

voice-recognition software to transcribe Crutcher's recorded field notes, or secretarial assistance with same,[17] (f) occasional assistance with site inspections and clerical functions, and (g) a "hands-free" phone device so that he could take notes and talk on the phone simultaneously.  (Plaintiff's Exh. 38.)

The Board purchased a digital voice-activated recorder for Crutcher on or about March 27, 2003, apparently in response to his counsel's request.  (Plaintiff's Exh. 40, 44; Crutcher Dep., at 31.) The Board also provided computer training to plaintiff in the first half of 2002 to improve his proficiency with the computer.  (Plaintiff's Exh. 44, 51; Crutcher Dep., at 53.)[18]

In May 2003, plaintiff's counsel sent another letter to the Board's counsel in which she "invit[ed] the Housing Board to engage in an interactive process regarding possible accommodations for Mr. Crutcher pursuant to ADA guidelines."  (Plaintiff's Exh. 58.)  Plaintiff's counsel noted that the only accommodation afforded plaintiff as of that time was the purchase of a voice-activated recorder, and emphasized that Crutcher wanted to continue working for the Board with reasonable accommodations for his disability.  (*Id.*)

In April 2004, the Board made arrangements for a flurry of accommodations that Crutcher had apparently been requesting for some time.  First, the Board approved the purchase of a digital camera that Crutcher would be able to operate with one hand.  (Plaintiff's Exh. 48.)[19]  Second, during the same

---

[17]     With respect to this requested accommodation, plaintiff testified that its functional equivalent would be to have clerical staff transcribe his tape-recorded notes, but only "if the clerical help had time to do it."  (Crutcher Dep., at 45.)  Beach testified that he did not think such software would improve Crutcher's efficiency, but that he had no idea whether it was cost-prohibitive because he did not know how much the software cost.  (Beach Dep., at 81.)  In Beach's view, there was no need to investigate the software accommodation because plaintiff had the option to utilize clerical staff "any time he wants to."  (*Id.*)

[18]     Crutcher maintains that he was the only Board employee required to attend the same training class twice in January 2002.  (Plaintiff's Brief, at 3.)  The record (which is lacking Crutcher's affidavit as well as the Crutcher deposition pages cited by plaintiff) does not support this allegation; rather, the only evidence on this point is Beach's testimony that this training was mandatory for all Board employees, including Crutcher.  (Beach Dep., at 52-53; *see also* Plaintiff's Exh. 51.)

[19]     This accommodation was contingent on Crutcher "shopping" for a suitable camera and presenting all information regarding same to the Board, as a basis for a purchase or requisition form.

month, Beach prepared a Request for Purchase for a measuring wheel and "strait line laser tape" to assist Crutcher in measuring ground distances with one hand, as well as vertical and diagonal distances without the need to climb ladders.  (Plaintiff's Exh. 49.)  Third, on April 27, 2004, the Board arranged for the purchase of a cordless headset so that Crutcher could answer telephone calls and take notes simultaneously.  (Plaintiff's Exh. 60; Crutcher Dep., at 45.)  Beach conceded that the ordering of this equipment for Crutcher "could have been done more expeditiously" than it was.  (Beach Dep., at 68.)

### 4.    *The EEOC Charge.*

On July 25, 2003, the Equal Employment Opportunity Commission's Birmingham District Office received a Charge of Discrimination (the "Charge") from Crutcher dated July 16, 2003.  In the Charge, Crutcher alleged as follows: (a) that he had been subjected to disability discrimination by the Board dating back to December 3, 2001 (the date of his injury); (b) that because of his injury plaintiff was substantially limited in major life activities of performing manual tasks, lifting, balancing, climbing, crawling, grasping, pushing and pulling; (c) that the Board "refused to engage in the interactive process relative to [his] requests for accommodations"; (d) that the Board had imposed driving restrictions on plaintiff that were inconsistent with his treating physician's opinions; and (e) that the Board had given him poor evaluations based on stated concerns that could have been alleviated with reasonable accommodation.  (Plaintiff's Exh. 43.)  Upon receiving a right-to-sue letter from the EEOC, Crutcher initiated this action.

## II.    **Summary Judgment Standard.**

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats &*

---

(*Id.*)  It does not appear that Crutcher ever followed through in this regard.  (Knight Dep., at 96.)  Crutcher has not been given access to a camera by the Board that he could operate with one hand.  (*Id.*; Beach Dep., at 43.)  Before April 2004, Crutcher satisfied his photographic needs by using his personal camera and "quite often" having another staff member accompany him to job sites to take photographs.  (*Id.* at 43-44.)

*Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

## III.    Analysis.

The Board maintains that it is entitled to summary judgment on six grounds.  First, the Board asserts that Crutcher's claims are barred because his EEOC Charge was filed untimely.  Second, the Board maintains that the record does not support a finding that Crutcher has a disability because he has failed to come forward with comparative evidence.  Third, the Board argues that it did reasonably accommodate Crutcher and engage in the interactive process with him to the extent required by law. Fourth, the Board contends that any claim predicated on the driving restriction is precluded as a matter of law under the "direct threat" provisions of the ADA.  Fifth, the Board asserts that Crutcher cannot recover out-of-pocket expenses incurred in performing his Rehabilitation Specialist duties.  Sixth, the Board states that there is no evidence that the Board acted with malice or reckless indifference to his

federally protected rights.  Each of these assertions will be considered in turn.

   A.      *Timeliness of EEOC Charge.*

   Under the ADA, a plaintiff must exhaust certain administrative remedies before filing suit.  *See*
*Maynard v. Pneumatic Products Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) ("Timely filing a
charge of discrimination is a prerequisite to bringing suit under both Title VII and the ADA."); *see*
*generally Zillyette v. Capital One Financial Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) (ADA
plaintiffs must comply with same procedural requirements for suit as plaintiffs in Title VII cases).
Initially, a plaintiff must file a charge of discrimination with the EEOC within a specified time after the
complained-of discriminatory act.  The duration of that time period depends on whether the charge is
filed in a "deferral state" or a "non-deferral state."[20]  In a non-deferral state such as Alabama, the
charge must be filed within 180 days of the last discriminatory act.  *See Wilkerson v. Grinnell Corp.*,
270 F.3d 1314, 1317 (11th Cir. 2001); *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1263 (11th Cir.
2003); *Mayo v. Allstate Ins. Co.*, 311 F. Supp.2d 1329, 1333 (M.D. Ala. 2004); *Tipp v. AmSouth*
*Bank*, 76 F. Supp.2d 1315, 1327 (S.D. Ala. 1998).   The burden rests with the plaintiff in an ADA
action to establish that he filed his EEOC charge in a timely manner.  *See Maynard*, 256 F.3d at 1262.

   The Board points out that Crutcher did not file his EEOC Charge until July 25, 2003, fully 19
months after he sustained his on-the-job injury.  According to the Board, because plaintiff filed his
EEOC Charge on July 25, 2003, any ADA claims he might have concerning defendant's acts or
omissions prior to January 27, 2003 (180 days pre-filing) are time-barred.  (Defendant's Brief, at 9.)
Taking its position one step further, the Board asserts that plaintiff is complaining exclusively about
events preceding the January 2003 accrual date and that the Complaint therefore should be dismissed
as untimely without even reaching the merits.[21]

---

   [20]      The distinction is that "[d]eferral states are those that have a state agency equivalent to
the EEOC," while non-deferral states do not.  *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1263 (11th
Cir. 2003).

   [21]      Implicit in the Board's argument is the notion that a plaintiff must file an EEOC Charge
within 180 days after the alleged discrimination begins.  (Plaintiff's Brief, at 9-10.)  The Court's
understanding, however, is that the exhaustion requirement contemplates that a charge be filed no later

Undoubtedly, plaintiff's Complaint does embrace alleged acts of discrimination preceding the January 2003 accrual date, including without limitation the unilateral Board-imposed driving restriction (January 2002), the poor mid-2002 performance evaluation (July 2002), and plaintiff's first formal written request for accommodations (October 2002).  Be that as it may, the Court cannot accept the Board's assertion that "[a]ll of the claims in the Plaintiff's complaint and EEOC complaint state allegations that did or would have occurred before the accrual date" of January 2003.  (Reply Brief, at 7.)  For example, the Board continued to squelch Crutcher's recurring requests to engage in work-related driving until August 2003.[22]  The Board did not respond in a reasonably prompt manner to Crutcher's request in February 2003 for several specific accommodations, and did not provide many of the requested accommodations.  The Board did not respond in a reasonably prompt manner to Crutcher's request in May 2003 to "engage in an interactive process regarding possible accommodations."  (Plaintiff's Exh. 58.)  Simply put, plaintiff's evidence is that the Board rebuffed his continuing efforts to discuss and secure reasonable accommodations throughout the first half of 2003.  Thus, a fair and accurate characterization of Crutcher's ADA claims is that they relate both to events and occurrences preceding January 2003, as well as to events and occurrences postdating January 2003.  As to the latter occurrences, plaintiff's EEOC Charge was plainly filed within the requisite limitations period.

---

than 180 days after the last act of discrimination occurs, not 180 days after the first such act.  *See, e.g., Wilkerson*, 270 F.3d at 1317 ("For a charge to be timely in a non-deferral state ..., it must be filed within 180 days of the last discriminatory act.").

[22]    Defendant would apparently cast this evidence aside as a mere "past violation" because the decision not to allow Crutcher to drive was made in January 2002.  (Reply Brief, at 7.)  But Crutcher repeatedly requested, both formally and informally, permission to drive, and the Board persistently denied those requests until August 2003.  Moreover, each day when Crutcher came to work, even for several months after the January 2003 accrual date, the Board prohibited him from driving his car or a Board vehicle on Board business.  These circumstances reflect an ongoing, continuing violation, rather than a discrete occurrence that happened once and was never repeated.  *Compare Bazemore v. Friday*, 478 U.S. 385, 395, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), ("[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII").

Based on the foregoing, the Court finds that Crutcher's ADA claims are timely to the extent that they are predicated on denials of reasonable accommodations or discriminatory work restrictions imposed or perpetuated after January 27, 2003.  The summary judgment record, taken in the light most favorable to Crutcher, reflects that several of the acts and omissions of which he complains took place during the 180-day period preceding his EEOC Charge.  That plaintiff was allegedly subjected to discriminatory acts outside the requisite 180-day filing period does not preclude him from bringing a timely EEOC Charge as to wrongful acts occurring within that timeframe.  *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.").  Defendant's request for summary judgment on this basis is **denied**.

That said, defendant's timeliness argument does have traction as to each discrete act of discrimination about which Crutcher complains that preceded January 2003.  Plaintiff has not brought a hostile environment claim and has not attempted to align his claims against the Board with that strain of *Morgan* authority allowing hostile environment claims to encompass events occurring outside the relevant limitations period.[23]  In *Morgan*, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 113; *see also Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1180 (11th Cir. 2005) (acts of discrimination affecting plaintiff's salary before EEOC limitations period are time-barred, and plaintiff's claims are confined to discriminatory acts affecting her pay during that period).  Such

---

[23]    *See, e.g., Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1179 (11th Cir. 2005) (for hostile environment claims, consideration of allegations outside statutory time period is permissible for purposes of assessing liability, so long as at least one act contributing to hostile environment took place within statutory time period); *Lindsey v. Burlington Northern Santa Fe Railway Co.*, 266 F. Supp.2d 1338, 1343 (N.D. Ala. 2003) ("A Title VII claimant alleging discrete acts of discrimination (as opposed to a claim based on a hostile environment) can pursue only those claims based on discriminatory acts that occurred in the 180-days immediately preceding the filing of a charge of discrimination with the EEOC.").

"discrete acts" include termination, failure to promote, denial of transfer or refusal to hire.  *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1281 (11th Cir. 2002).  The Board's issuance of an unfavorable performance evaluation to Crutcher in July 2002 was just such a discrete act, as was the Board's nonresponsiveness to plaintiff's request for accommodation in October 2002.  Those claims are plainly time-barred under *Morgan*.  Thus, defendant's Motion for Summary Judgment is **granted** as to all of plaintiff's claims predicated on discrete acts and omissions preceding January 27, 2003, for failure timely to exhaust administrative remedies.[24]

In so concluding, the Court is cognizant of plaintiff's equitable tolling argument, pursuant to which he requests that the limitations period be tolled because he was "engaged in negotiations with Defendant" and "was actively pursuing accommodations in the workplace."  (Plaintiff's Brief, at 16.)[25] Courts have permitted equitable tolling of the EEOC filing period under certain circumstances. *See Carter v. West Pub. Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000) ("Under equitable tolling, Title VII's statute of limitations does not start to run until a plaintiff knew or reasonably should have known that she was discriminated against.").  However, those circumstances are quite limited.  *See also Jones*, 331 F.3d at 1264-68 (equitable tolling may apply in ADEA context where defendant wrongfully concealed facts or where a person with reasonably prudent regard for his rights would not suspect a

_____

[24]     Nothing in this Order forbids or in any way constrains Crutcher from relying on evidence of pre-January 2003 occurrences as background evidence to support his timely claims.  *See Morgan*, 536 U.S. at 113 ("[T]he statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim."); *see also Ledbetter*, 421 F.3d at 1179 ("Pre-limitations acts can be used, where relevant, as background evidence in support of the timely claim, ... but they cannot themselves form the basis for liability.") (citations omitted).

[25]     The only record evidence cited by Crutcher in support of his claim that he was "in negotiations" with the Board is Exhibit 58, which is a May 2003 letter from his counsel to the Board's counsel requesting accommodations.  There is no evidence is to whether, when, if or how the Board responded.  Thus, plaintiff does not identify any evidence that there were actual "negotiations" transpiring at that time, much less that those negotiations had reached a level of seriousness that might have justified postponing his EEOC Charge.

discrimination claim).[26]   Here Crutcher does not maintain that he was lulled into a false sense of security by his negotiations with the Board, that the Board wrongfully concealed relevant information, or that he was not reasonably on notice of his ADA claims by January 27, 2003 (the relevant accrual date).  Instead, he simply maintains that his "negotiations" with the Board are grounds for equitable tolling.  A plaintiff's attempts to pursue other avenues to resolve a dispute do not toll the requisite EEOC filing period.  *See Portera v. State of Ala. Dept. of Finance*, 322 F. Supp.2d 1285, 1289 (M.D. Ala. 2004) (resorting to an internal grievance procedure is not a ground for tolling EEOC filing period).  More generally, the Court is of the opinion that Crutcher has not demonstrated the sort of extraordinary circumstances that might place this action within the very narrow band of cases as to which equitable tolling is appropriate.

B.     ***Plaintiff's Disability Status.***

"In order to establish a *prima facie* case of ADA discrimination, [plaintiff] had to show that he: (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on his disability."  *Collado v. United Parcel Service, Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005).  On summary judgment, the Board takes the position that Crutcher has made an inadequate showing as to the first of these elements.

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); *see also Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004).  "What [plaintiff] had to do to win on this § 12102(2)(A) definitional track is to provide evidence from which a jury reasonably could find that his [impairment] substantially impairs at least one major life activity."  *Collado*, 419 F.3d at 1155.  ADA regulations

--------

[26]     The burden is on the party seeking the benefit of equitable tolling to establish that such tolling is warranted.  *See Bost v. Federal Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004); *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993); *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 661 (11th Cir. 1993).  This burden is heavy, as the Eleventh Circuit has opined that "[e]quitable tolling is an extraordinary remedy which should be extended only sparingly."  *Bost*, 372 F.3d at 1242.

define "major life activities" as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).   In determining whether an impairment is substantially limiting, courts consider the nature and severity of the impairment, its duration or expected duration, and the permanent or long-term impact of or resulting from the impairment.  29 C.F.R. § 1630.2(j)(2).

Viewed in the light most favorable to plaintiff, the record shows that Crutcher has been unable to move, use, or have any sensation in his right arm since December 2001.  Crutcher's treating physician has declared him to have a 100% permanent partial impairment of the right upper extremity, or a 60% impairment of the whole person.  In the wake of his injury, the record shows, Crutcher has substantial difficulty performing basic tasks like getting dressed, tying his shoes, flossing his teeth, washing dishes, bathing, preparing food and the like.[27]  Crutcher cannot climb ladders or crawl under houses, and he is limited in his ability to lift, push, pull, grasp and reach because he only has one functioning arm.  On its face, this evidence is strongly supportive of a finding that plaintiff is substantially impaired in such life activities as lifting, reaching, caring for himself, and performing manual tasks.

Notwithstanding this compelling showing, defendant urges the Court to conclude that plaintiff has failed to meet his *prima facie* burden of establishing that he is disabled.  Animating this ground for Rule 56 relief is defendant's contention that plaintiff has failed to show how well the average person in the general population performs these major life activities.  In this regard, the Board repeatedly invokes the Eleventh Circuit's determination in *Maynard v. Pneumatic Products Corp.*, 233 F.3d 1344 (11th Cir. 2000) ("*Maynard I*"), that "comparative evidence is necessary before the case may be turned over to a jury."  (Defendant's Brief, at 12; Reply Brief, at 9.)  Defendant reasons that because plaintiff has failed to present such comparative evidence, he has not shown that he suffers from a disability and his

---

[27]     The Supreme Court has found that these activities are just the sort that courts should examine in assessing a plaintiff's contention that he is substantially impaired in performing manual tasks. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 202, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (opining that "household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives, and should have been part of the assessment of whether respondent was substantially limited in performing manual tasks").

ADA claims cannot survive summary judgment scrutiny.

The Board correctly frames the holding of *Maynard I*, wherein the panel explained that an "obvious and crucial element in a plaintiff's prima facie case" is that he "present comparator evidence to demonstrate [his] substantial limitations." 233 F.3d at 1349. Unfortunately, defendant overlooks the glaring fact that *Maynard I* is no longer good law, having been vacated in its entirety by the panel upon *sua sponte* reconsideration in *Maynard v. Pneumatic Products Corp.*, 256 F.3d 1259 (11th Cir. 2001) ("*Maynard II*"). Careful review of *Maynard II* leads inexorably to the conclusion that the basis for vacating *Maynard I* was the panel's unwillingness to ascribe to the comparator evidence doctrine; indeed, *Maynard II* took pains to affirm the lower court's ruling on timeliness grounds so as to sidestep the issue of whether the plaintiff met the disability threshold.[28]

In the wake of *Maynard II*, the lone authority on which the Board relied for the proposition that comparator evidence is an essential part of plaintiff's *prima facie* case has been washed away. Furthermore, other jurisdictions have, with few exceptions, consistently held that such comparator evidence is <u>not</u> necessary, if the limitations wrought by an impairment are sufficiently obvious that a jury could reasonably infer substantial limitation in a major life activity based on their own life experiences and observations. *See, e.g., E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005) (evidence that plaintiff had severe difficulty walking one city block because of neurological impairment to leg was such that reasonable jury could conclude, based on its own life experience and without comparator evidence, that plaintiff's limitation was substantial compared to the walking most people do); *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir. 2001) ("comparative

---

[28]    If the *Maynard* panel's intent to distance itself from a comparator evidence requirement were not clear from the majority opinion, Judge Fletcher (who had joined the majority in *Maynard I*) authored a stinging dissent in *Maynard II* clarifying her stance. This dissent candidly declared that "we erred" in finding that the plaintiff had failed to show that he was disabled. *Maynard II*, 256 F.3d at 1266. With regard to *Maynard I*'s finding that the plaintiff's *prima facie* case failed because he did not show comparator evidence, Judge Fletcher wrote, "[t]hat conclusion was simply wrong. ... [H]is impairment is so obviously substantially limiting that he needed to present no comparator evidence as part of his *prima facie* case" because the jury's common sense and life experience would enable them to determine whether the plaintiff in those circumstances is substantially impaired in a major life activity. *Id.*

evidence is not required as a matter of law to withstand a motion for summary judgment where the impairment appears substantially limiting on its face").[29]

In considering the appropriate quantum of proof for Crutcher to establish that his 100% permanent disability of his right arm and shoulder are substantially limiting in major life activities, the Court finds persuasive the reasoning in *Witt v. Northwest Aluminum Co.*, 177 F. Supp.2d 1127, 1131 (D. Or. 2001).  The *Witt* court pointed out that the ADA does not require "direct evidence of the abilities of the average person," but instead simply requires a plaintiff "to put forth some evidence that she is substantially limited with respect to a major life activity."  *Id.* at 1131.  *Witt* reasoned that "in appropriate cases factfinders may draw on their own experience to determine whether particular impairments constitute 'substantial limitations' of major life activities. This is such a case.  Factfinders do not need expert testimony to understand that a person confined to a wheelchair is substantially limited in the major life activity of walking."  *Id.*  This case is similar to *Witt*.  The Court is convinced that a reasonable jury will not require comparator evidence to determine whether Crutcher's specific impairment is substantially limiting as defined in the ADA.  In particular, a factfinder may rely on its own life experiences and common sense to assess the extent of Crutcher's limitations resulting from his total inability to use his right arm, as compared to what the average person in the general populace with two functioning arms is able to do with respect to lifting, reaching, pushing, pulling, grasping, climbing, crawling, and performing manual tasks.  Stated differently, Crutcher's impairment appears substantially limiting on its face.  Under these particular circumstances, the Court finds that plaintiff need not present comparator evidence as to the functional abilities of the average person in order to make a *prima facie* showing of a disability.

Because the Board's challenge to plaintiff's disability status is predicated entirely on his failure to present comparator evidence, and because no such comparator evidence is necessary on the record

---

[29]        *But see Harmon v. Sprint United Management Corp.*, 264 F. Supp.2d 964, 969 (D. Kan. 2003) ("although some impairments may be considered substantially limiting on their face, most require that the plaintiff present comparative evidence that the limitations are significantly below those of the average person") (citation omitted).

presented here, summary judgment is inappropriate on this basis.[30]

### C.      Reasonable Accommodation / Interactive Process.

Defendant's third ground for seeking Rule 56 relief is its contention that the Board did reasonably accommodate Crutcher's impairment and engaged in the interactive process with him. According to the Board, plaintiff requested ten accommodations, of which six were granted, three were denied as an undue hardship, and one would have been granted had Crutcher provided certain follow-up information.  (Defendant's Brief, at 14-17.)  The Board also insists that it interacted with plaintiff regarding his need for accommodations, both through Beach (his direct supervisor) and Sutherland (the human resources employee).  (*Id.*)

Defendant's alleged failure to provide reasonable accommodation to Crutcher lies at the heart of this dispute.  It is well settled that an ADA violation occurs when an employer fails to provide "reasonable accommodations" for an employee with a disability, unless doing so would impose an undue hardship on the employer.  *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *see also Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) ("An employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer.").  "An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job."  *Earl*, 207 F.3d at 1365.  However, a disabled employee's right to reasonable accommodation does not equate to a right to the accommodation of his choice.  *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997) (emphasizing that employers are not required in every instance to provide employees every conceivable accommodation possible); *Sears*, 417 F.3d at 802 ("an employer is not required to provide the particular

---

[30]      In its reply brief, the Board suggests that Crutcher cannot show that his arm injury has substantially limited the major life activity of working.  (Reply Brief, at 9.)  Be that as it may, the Court is unaware that Crutcher has ever maintained in this lawsuit that his impairment substantially limits that major life activity.  To the contrary, the Complaint references the major life activities of "manual tasks, lifting, pulling, balancing, climbing, crawling, grasping and pushing."  (Complaint, ¶ 5.)  The question of whether Crutcher is substantially impaired in working is not properly before the Court, inasmuch as he has never contended that he is.

accommodation that an employee requests"). "Whether an accommodation is reasonable depends on specific circumstances." *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998).

A corollary to the "reasonable accommodation" requirement is the employer's obligation to engage in an "interactive process" with the disabled employee to determine whether and which reasonable accommodations are feasible. *See Sears*, 417 F.3d at 797 ("the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation"); *Velente-Hook v. Eastern Plumas Health Care*, 368 F. Supp.2d 1084, 1097 (E.D. Cal. 2005) (similar). Simply put, once an employer becomes aware of the need for a reasonable accommodation, it "must make a reasonable effort to determine the appropriate accommodation. The appropriate accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. § 1630.2(o)(3). "Underlying the interactive process is the duty of the parties to act in good faith while searching for appropriate reasonable accommodation." *O'Dell v. Department of Public Welfare of Pennsylvania*, 346 F. Supp.2d 774, 785 (W.D. Pa. 2004).[31]

---

[31] Despite their recognition of the "interactive process" duty, courts routinely find that the failure to participate in such an interactive process does not give rise to liability in the absence of a failure to provide reasonable accommodation. *See Lucas*, 257 F.3d at 1256 n.2 (unless employee demonstrates that a reasonable accommodation was possible, the "employer's lack of investigation into reasonable accommodation is unimportant," notwithstanding ADA's "interactive process" requirement); *see generally Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002) ("the (only) consequence of the employer's failing to consult with the employee concerning a possible accommodation of the employee's disability is to shift the burden of production concerning the availability of a reasonable accommodation from the employee to the employer"); *Fleetwood v. Harford Systems Inc.*, 380 F. Supp.2d 688, 701 (D. Md. 2005) ("an employee cannot prevail simply by demonstrating that his employer failed to engage in the interactive process; he also must show that this failure to engage in the process resulted in the failure to find an appropriate accommodation"); *Velente-Hook*, 368 F. Supp.2d at 1097-98 (employer who fails to engage in interactive process in good faith is liable under ADA only if a reasonable accommodation would have been possible); *Pantazes v. Jackson*, 366 F. Supp.2d 57, 70 (D.D.C. 2005) ("Because the interactive process is not an end in itself, it is not sufficient for the employee to show that the employer failed to engage in an interactive process or that it caused the interactive process to break down."). Thus, the interactive process is properly viewed as a tool for facilitating reasonable accommodations, rather than a separate legal requirement that may independently yield ADA liability. Stated differently, an employer's failure to engage in the interactive process under

The law is clear that an employer's unreasonable delays in identifying and implementing reasonable accommodations can constitute a lack of good faith for purposes of the interactive process, and can serve as evidence of an ADA violation. *See Pantazes v. Jackson*, 366 F.Supp.2d 57, 70 (D.D.C. 2005); *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 24 (1st Cir. 2004) ("An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute."); *Carroll v. England*, 321 F. Supp.2d 58, 69 (D.D.C. 2004) ("when the duty to reasonably accommodate arises, both employee and employer must exchange essential information and neither side can delay or obstruct the process").[32]

The record shows that in February 2003 plaintiff (by and through counsel) sent the Board a list of seven specific requested reasonable accommodations to enable him to perform the essential functions of his job, including a Dictaphone, a measuring tool, a one-handed digital camera, a software program for generating floor plans, voice-recognition software for transcription of field notes, occasional assistance with site inspections and clerical functions, and a hands-free phone device.[33]

---

the ADA is actionable only if and to the extent that such failure culminates in a failure to provide reasonable accommodation.

[32]    In opposition to this principle, defendant relies on *Hartsfield v. Miami-Dade County*, 90 F. Supp.2d 1363 (S.D. Fla. 2000), in which the plaintiff unsuccessfully claimed that the employer violated the ADA by unreasonably delaying the provision of a reasonable accommodation. The *Hartsfield* employer provided the accommodating equipment some ten months after plaintiff requested it. *Hartsfield* is readily distinguishable for two reasons. First, the *Hartsfield* court found that the delay "was neither unreasonable, the County's fault or deliberate, but was caused by a combination of incomplete documentation, lost or misplaced documentation, and the time required for delivery of the purchased machine." *Id.* at 1365-66. No such evidence of extenuating circumstances excusing or explaining the Board's delay has been offered here, so there is no record basis for deeming that delay "reasonable." Second, *Hartsfield* stands for the proposition that delay in providing a reasonable accommodation is not violative of the ADA "as long as the employee receives some other accommodation" in the interim. *Id.* at 1373. Here, there are genuine issues of fact as to the sufficiency of any "other accommodations" that the Board may have provided to Crutcher before approving a camera, hands-free phone device and measuring wheel in 2004.

[33]    In referencing ten requested accommodations, the Board would apparently (i) add to this list Crutcher's request to drive a Board vehicle, (ii) identify a request for a tape recorder as separate and distinct from a request for a Dictaphone, and (iii) break down the request for assistance in

Taken in the light most favorable to Crutcher, the record further shows that many of these requested items were never provided, were provided only partially and inadequately, or were provided more than a year after the February 2003 request.

The voice-activated tape recorder was provided in March 2003, shortly after plaintiff requested same.[34]   Therefore, there can be no reasonable question that the Board fully accommodated plaintiff's request in a prompt and timely manner on this issue.   The Motion for Summary Judgment is **granted** insofar as plaintiff's ADA claims are predicated on the delay from February 2003 to March 2003 in furnishing him a Dictaphone.

With respect to the measuring wheel and cordless headset, the record shows that the Board furnished these items to plaintiff (if ever) no earlier than April 2004.   Defendant has proffered no explanation for the 14-month delay between plaintiff's written request for these items and the Board's decision to provide same to him as reasonable accommodations.   As for the camera, the Board for a time accommodated this request by sending another staff member with Crutcher to take photos for him; however, the evidence in the light most favorable to plaintiff produces an inference that this assistance was sporadic at best.   No action was taken on the camera request until April 2004, when the Board finally approved the purchase of such a camera for Crutcher, contingent on his providing Beach with specifications and information regarding the device.[35]   Again, the record is silent as to why defendant

_____

the field and with clerical tasks into two separate requests (one for field assistance, the other for clerical assistance).   Irrespective of how the counting is done, the general nature and tenor of Crutcher's requests for accommodation are undisputed.

[34]   Actually, plaintiff requested a "Dictaphone" rather than a voice-activated tape recorder. The Court does not presume to know whether these gadgets are identical.   The record does not show, and plaintiff does not suggest, any substantial material differences between the two devices that might preclude the latter from being a reasonable accommodation to satisfy plaintiff's request for the former.

[35]   As currently constituted, the record lacks evidence that Crutcher followed up on this request for information.   (Again, plaintiff's affidavit has been omitted from the summary judgment record.)   However, that detail is beside the point for purposes of the instant analysis, which turns on the Board's unexplained delay in responding to plaintiff's detailed, specific written requests for accommodation, such that Crutcher was for all intents and purposes not accommodated for more than a year.

-24-

tarried for more than a year after the request was made to authorize purchase of such a camera on plaintiff's behalf.  As the authorities set forth *supra* explain, an employer's unreasonable delay in engaging in the interactive process or in furnishing a requested accommodation may be evidence of the employer's lack of good faith and failure to furnish reasonable accommodations.  Such is the case here.

The clerical and field assistance requested by Crutcher was provided; however, genuine issues of material fact remain as to the adequacy of that assistance.  On the topic of clerical assistance, the record includes a March 2002 memorandum directing Crutcher (and all other Rehabilitation Specialists) to complete their own clerical work, as well as various written exhortations from Beach in 2002 and 2003 regarding the efficacy and proficiency of Crutcher's clerical skills, and his need to improve same.  Such evidence calls into question whether the Board really did accommodate Crutcher's need for clerical help to perform the essential functions of his job.  It is a fact-intensive inquiry to ascertain whether the clerical assistance furnished by the Board was adequate to constitute a "reasonable accommodation" of Crutcher's impairment.  Likewise, with regard to field assistance, the record includes evidence that Crutcher often had to drive himself and use his personal camera and other equipment on job sites, raising the inference that field assistance was not readily available to him when he required it to perform his essential functions.  Given the conflicting evidence, the Court cannot find as a matter of law that the degree, nature and extent of the field assistance provided by the Board was sufficient to satisfy its reasonable accommodation obligation.  Accordingly, on this record, the Court finds genuine issues of material fact as to the sufficiency of the Board's accommodations to plaintiff on both the clerical and field assistance fronts.

As for the two software programs, defendant maintains that neither request was reasonable and that it was therefore justified in rejecting them.  In particular, the Board asserts that Crutcher did not need to generate floor plans.  Although Crutcher acknowledged that to be true at the time of his deposition, he disputes the point for other times pertinent to this action.  From the inconclusive evidence in the record, the Court cannot determine whether generating floor plans was a regular, essential function of plaintiff's job during the relevant time period.  As such, the Court cannot find as a matter of law that the Board did not need to accommodate plaintiff's request for such software.  Likewise, the

Board contends that purchasing voice-recognition transcription software for Crutcher would have been unreasonable because his transcription needs were adequately accommodated through the provision of clerical assistance and a voice-activated tape recorder.  Again, given the evidence that Crutcher was often left to perform his own clerical work, the sufficiency of these accommodations to enable Crutcher to perform the essential functions of his job is a question subject to competing factual inferences and is therefore not amenable to resolution on summary judgment.

For all of the foregoing reasons, the Court finds that there are genuine issues of material fact as to each of the following: (1) whether the Board's delay of more than a year to approve plaintiff's requests for a digital camera, measuring wheel and hands-free telephone device constitute a failure to provide reasonable accommodation within the meaning of the ADA; (2) whether the limited clerical and field assistance furnished to Crutcher was sufficient to satisfy the Board's obligation of reasonable accommodation; (3) whether the floor-plan software was a reasonably necessary accommodation to allow plaintiff to perform an essential function of his job; and (4) whether the level of clerical assistance furnished by the Board to Crutcher was sufficient to render his request for voice-recognition software unreasonable as an accommodation for his disability.  Accordingly, the Board's Motion for Summary Judgment is **denied** insofar as it argues that defendant satisfied its reasonable accommodation burden as a matter of law in each of these areas.  The Motion is **granted** as to the Dictaphone, inasmuch as the Board's purchase of a voice-activated tape recorder in March 2003, one month after plaintiff's attorney requested it, plainly satisfies the reasonable accommodation threshold.

### D.  *Direct Threat.*

The Board also seeks summary judgment as to plaintiff's ADA interference claim relating to defendant's unilateral imposition of a driving prohibition on plaintiff from January 2002 through August 2003.  The Board asserts that this restriction was justified under the "direct threat" provisions of the ADA, which create a defense to ADA claims where the employer used qualification standards that "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  Pursuant to the statute, "direct threat" means "a significant risk to the health or safety of others that cannot be eliminated by reasonable

-26-

accommodation."  42 U.S.C. § 12111(3).  According to the Supreme Court, "[t]he direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job, reached after considering, among other things, the imminence of the risk and the severity of the harm portended."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (citations omitted).

Defendant argues that it forbade Crutcher from driving on Board business based on the assessment of Knight and the Board's workers' compensation insurer that plaintiff was incapable of safely driving a motor vehicle.  Because this decision was based on a perception that Crutcher's driving would pose a "direct threat," the Board maintains, it is entitled to summary judgment on this aspect of Crutcher's claim pursuant to 42 U.S.C. § 12113(b).  But the record simply does not permit the Court to find as a matter of law that Crutcher's driving would pose a significant risk to the health or safety of others that could not be eliminated with reasonable accommodation.  Crutcher drove himself to and from work every day, apparently without serious mishap or endangerment.  More importantly, Crutcher's treating physician repeatedly and consistently opined that he <u>could</u> safely operate a motor vehicle, notwithstanding his impairment.  Defendant offers no medical, vocational or other objective evidence to rebut Dr. Meyer's opinions on this front.  That the Board's human resources officials and insurance providers may have subjectively felt that it was unsafe for Crutcher to drive does not make it so, and it certainly does not satisfy the quantum of proof needed under *Echazabal* to prevail on its "direct threat" defense as a matter of law.  *See Branham v. Snow*, 392 F.3d 896, 906-07 (7th Cir. 2004) (in order to receive summary judgment pursuant to the "direct threat" defense, direct threat evidence must be so one-sided that no reasonable jury could find for plaintiff).

A reasonable jury could easily find on the record presented that Crutcher did not pose a direct threat to himself or others by operating a motor vehicle, and that the Board's unilateral restriction on plaintiff in this regard was the product of informed assumptions, baseless suppositions, preconceived guesses, and discriminatory animus.  Accordingly, the "direct threat" issue must be resolved by a jury,

and the Board's request for summary judgment on that basis is **denied**.[36]

      **E.**      *Claims for Out-of-Pocket Expenses.*

Next, the Board requests summary judgment on plaintiff's claims for reimbursement of out-of-pocket expenses incurred in traveling in his personal vehicle, using his personal camera, and purchasing a voice recorder and measuring wheel.  (Defendant's Brief, at 18-19; Reply Brief, at 16-17.)  Plaintiff maintains that these expenses were necessarily incurred because the Board refused to provide him with reasonable accommodations to enable him to perform the essential functions of his duties.

The parties offer not one shred of authority as to whether an ADA plaintiff may claim as an element of damages out-of-pocket expenses incurred in purchasing reasonable accommodations for himself where the employer refused to provide same.  It is not the function of this Court to perform the parties' research for them; therefore, the undersigned declines to undertake *sua sponte* investigation into the legal recoverability of this category of damages in the ADA context.

Instead of tackling the legal merits of such a damages claim, the parties' summary judgment disagreement turns on whether Crutcher voluntarily and unnecessarily incurred those expenses.  There is certainly evidence in the record from which a reasonable factfinder could resolve this question in either direction.[37]  Assuming without deciding that the voluntariness of those out-of-pocket expenses

---

[36]     In so finding, the Court acknowledges that "[t]he employee retains at all times the burden of persuading the jury ... that he was not a direct threat."  *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996).  The Court's finding today is that the unrebutted medical evidence from Dr. Meyer, as well as the fact that Crutcher drove himself to and from work every day without incident, is sufficient to allow a reasonable jury to determine that he has satisfied that burden.

[37]     From Crutcher's standpoint, he requested accommodations, did not receive them, and then was subject to withering criticism for not performing his job effectively, which he could not do without driving a vehicle and using certain equipment.  Thus, Crutcher's reasonable position is that he incurred these expenses because they were the only way he could perform his essential functions and satisfy his employer's demands, given the Board's recalcitrance in the face of repeated requests for accommodation.  But the Board's position likewise has merit, if the supporting facts are believed by a jury.  The Board says that Crutcher never needed to drive because the Board offered to provide transportation for him as needed.  The Board also says that Crutcher did not need to purchase a recorder and measuring wheel because the Board did so for him.  Again, if this evidence were believed, it would tend to show that Crutcher incurred the out-of-pocket expenses voluntarily and unnecessarily.

has some legal bearing on their viability as an element of damages under the ADA, the Court finds that genuine issues of material fact preclude resolution of this question at the Rule 56 stage. Defendant's Motion is **denied** on this basis.

> ### F.     *Punitive Damages.*

As a final ground for its Motion for Summary Judgment, defendant takes the position that there is no evidence that it acted with malice or reckless indifference to Crutcher's federally protected rights, and that Crutcher's claims for punitive damages should therefore be rejected as a matter of law. (Defendant's Brief, at 22.)  In response, plaintiff concedes, without explanation, that "punitive damages are not warranted in this action."  (Opposition Brief, at 34.)  Based on plaintiff's affirmative waiver of his claim for punitive damages, defendant's request for summary judgment on the question of whether it acted with malice or reckless indifference is **moot**.

## IV.     Conclusion.

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 42) is **granted in part, and denied in part**.  The Motion is **granted** as to plaintiff's ADA claims based on defendant's alleged acts or omissions preceding January 27, 2003, on grounds of timeliness.  The Motion is also **granted** as to plaintiff's claims for failure to provide a Dictaphone as a reasonable accommodation, given that such a device was furnished to plaintiff shortly after his February 2003 request for same.  The Motion is **moot** with respect to plaintiff's claims that the Board acted maliciously and with reckless indifference to his federally protected rights, inasmuch as Crutcher has waived his claims for punitive damages.  In all other respects, the Motion is **denied**.

DONE and ORDERED this 20th day of October, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE